IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:14-CR-354 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | |
| | ) | |
| MARCIA M. MASTERS, a.k.a. MARCIA KRONE, | ) | GOVERNMENT'S SENTENCING MEMORANDUM |
| | ) | |
| Defendant. | ) | |

Now comes the United States of America, by and through its counsel, Steven M.

Dettelbach, United States Attorney, and Marisa T. Darden and Matthew B. Kall, Assistant

United States Attorneys, and hereby submits the instant memorandum for this Court's

consideration in determining an appropriate sentence for Defendant Marcia M. Masters

(hereinafter, "Defendant") that is sufficient, but not greater than necessary, to comply with the

principles of federal sentencing.  For the reasons stated below, the Government requests this

Court sentence Defendant Marcia M. Masters (hereinafter, "Defendant") to the high end of the

applicable guideline range of 51-63 months' imprisonment.

I.    **Relevant Offense Conduct**

A.  **Factual Basis**[1]

On March 27, 2013, Defendant purchased two AR-15 M4 Rifles and a Smith and Wesson pistol from Stonewall Firearms in Broadview Heights, Ohio.  Specifically, Defendant and a man named Steve Farzam entered the store.  At the time of the purchase, Defendant was employed as a police officer with the Oakwood Village Police Department.  Defendant purchased the firearms in cash, and Stonewall employee Gary Donnett applied 5% law enforcement discount to Defendant's transaction.  The total price, with the discount and tax, was $3,138.27.

As part of the purchase, Defendant was required to fill out a Firearm Purchase Record, also known as ATF Form 4473.  By law, anytime an individual purchases a firearm from a dealer, he or she is required to answer a series of questions and provide personal identifying information.  The 4473 lists each firearm purchased and its make, model, and serial number.  Question 11a inquires whether the purchaser is the actual transferee/purchaser of the firearms.  The form explains that the purchaser is not the actual buyer if one is acquiring the firearms on behalf of another person.  Defendant checked yes, stating that she was the actual purchaser of the firearms.  After filling out this form and passing the National Instant Check system, Defendant was permitted to purchase the firearms, and left Stonewall with them in her possession.

On May 7, 2014, Steve Farzam sold one of the AR-15s Defendant purchased at Stonewall to a confidential informant (hereinafter, the "CI") working with ATF. The CI purchased the firearm for $1,800 - more than $700 above the price Defendant originally paid to Stonewall.  As part of that controlled buy, the CI drove to Farzam's business address at 1515 Ocean Avenue,

---

[1] All factual references are taken from reports generated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (hereinafter, "ATF").

and picked up the AR-15 from inside a closet in Farzam's office. The AR-15 was inside a box. The CI took the box and the firearm, and brought it to Farzam's home address, where they exchanged cash for the firearm. The CI then drove away from the home and soon after gave the AR-15, and the box which contained the AR-15, to ATF Special Agent Steve Goerke.

There was a partial label on the box showing partial lettering of "8.9LB" and "28MA" and the Federal Express logo, which led Special Agent Goerke to subpoena Federal Express shipping records. The records showed that the day after Defendant purchased the firearms, on March 28, 2013, three packages were shipped from a Federal Express/Kinko's store in Solon, Ohio to Steve Farzam's business address in Santa Monica, CA, which is 1515 Ocean Avenue, Santa Monica, the same address where the CI picked up the AR-15 during the undercover purchase. The boxes were listed on Steve Farzam's Federal Express Ground account. This information was consistent with the Federal Express shipping records showing one of the packages shipped weighed 8.9 lbs.

Special Agent Goerke requested a partial trace on the AR-15 recovered, and learned it had been purchased at Stonewall Firearms. Goerke then asked ATF Special Agent John Kilnapp in Cleveland to pull the original 4473 from Stonewall to determine the purchaser. Special Agent Kilnapp learned that the original purchaser was Defendant.

Based on the CI firearm sale, the fact that a total of three firearms had been purchased on the same date, and additional information relating to Steve Farzam, law enforcement obtained and executed a search warrant on Farzam's business and home addresses. Special Agent Goerke and state law enforcement recovered the Smith and Wesson purchased by Defendant inside Farzam's residence. In addition to the Smith and Wesson pistol, officers also recovered the following items in Farzam's possession: 15 firearms, ammunition, numerous firearm magazines,

3

multiple police badges and patches, a police helmet, ballistic helmets and vests, a body bunker, 12 hand-held radios with police frequencies, and two police light bars.

A Grand Jury indicted Defendant on one count of making false statements to a firearms dealer, in violation of Title 18, United States Code Section 922(a)(6).  The matter proceeded to trial on February 23, 2015.

### B.  Trial Testimony[2]

Additional factual information was elicited from several witnesses at trial.  Stonewall sales Associate Gary Donnett testified that he recognized Defendant because she had previously been to the store a few times to use their firing range.  Mr. Donnett knew Defendant was a police officer.  Mr. Donnett stated he recalled that Defendant had entered Stonewall on March 27th with a white male whom she introduced as a friend.  Mr. Donnett never learned that individual's name.  The three of them had a conversation, whereby Mr. Donnett learned the man was visiting from California.  After learning that Defendant was purportedly purchasing two AR-15s, Mr. Donnett offered light-hearted advice to not take such weapons to California, because possession of them was illegal in that state.  Mr. Donnett noted that, although he is normally somewhat suspicious of a person who buys multiple firearms for cash while in the presence of another individual, he was not suspicious in this instance, because he knew Defendant was a police officer.  In fact, knowing that she was a police officer, he readily applied Stonewall's law enforcement discount on Defendant's purchases.

It should be noted that twenty minutes before Defendant purchased the firearms, Stonewall's records indicated that Steve Farzam purchased six magazine cartridges from

---

[2] All references to trial testimony are taken from the undersigned's' recollection and notes.

Stonewall that would fit an AR-15. Farzam placed that transaction on a credit card in his name. No ammunition was purchased by either Farzam or Defendant.

Mr. Donnett testified that at some point in January 2015, Defendant approached him inside Stonewall and asked him to be a witness on her behalf. Their conversation lasted approximately 15 minutes.[3] In addition, a friend of Defendant testified for the Government. At trial, former Chagrin Falls Police Chief Lester LaGatta told the jury that Defendant told him that sometime after being arrested, she had placed the firearms she purchased on March 27th into a friend's storage facility, and that at some point the "friend from California" must have taken them unbeknownst to her.[4] Testimony also revealed that Defendant had previously resided in California. Special Agent Goerke learned during his investigation that Defendant previously had a California driver's license.

ATF Special Agents Goerke and Kilnapp both testified to the nature of the AR-15 firearm. They explained that the firearm was a high-powered rifle capable of accepting a high capacity magazine, and originally designed for the United States military for use in combat. In addition, Special Agent Goerke testified that the AR-15 as sold in Ohio is illegal to possess in the State of California. Several documents admitted at trial, including Defendant's credit report, demonstrated that she previously lived in California and maintained residence there.

There was also testimony at trial that there is only one Federal Express location in Solon, Ohio, which is a few miles from Oakwood Village where Defendant was a police officer. Key

---

[3] Mr. Donnett did not testify to the content of the conversation, but disclosed to the Government that Defendant told him that she surmised her "friend from California" must have taken the firearms from her at some point.

[4] Defense counsel conceded during his opening, and it was discussed during the Court's Final Pre-Trial Conference, that Defendant never reported the firearms stolen after she purchased them.

Bank records admitted at trial revealed that Defendant's Key Bank debit card was used to make a $2.00 purchase at a Solon Federal Express/Kinko's on or about March 29, 2013.  In addition, credit card records confirm Farzam was in Cleveland on March 27, 2013, and show that he deposited $2,500 into Defendant's checking account on March 11, 2013, sixteen days before Defendant purchased the firearms.  Defendant was convicted by a jury of the sole count of the indictment on February 27, 2015.

### C.  Additional Relevant Information[5]

While not discussed at trial, the CI had a recording device on during his/her interaction with Farzam on May 7. As part of their conversation, Farzam told the CI that he had acquired the AR-15 and two other firearms from Ohio with his friend "Marcia" who was a law enforcement officer in Ohio, and that the firearms were "registered to Marcia."  He told the CI that they had shipped the firearms via Federal Express from Ohio to California, and told Federal Express the firearms were violins. [6]  The CI inquired about purchasing an AR-10 (another assault rifle) from the CI.  Farzam offered to sell one to him, but informed the CI it would take a few weeks to get, as he could probably get one from his friend Marcia.  Farzam stated they paid cash to send the firearms. The CI further explained to Special Agent Goerke that he knew Defendant previously lived with Farzam, and had applied to be a police officer in California.

The second AR-15 purchased by Defendant at Stonewall Firearms on March 27 has not been recovered to date. ATF cannot confirm, but believes Farzam sold it to another individual. This belief is based on conversations the CI had with Farzam on May 7. The recording shows

---

[5] All factual references are taken from ATF reports and subpoenaed information shared with counsel in advance of trial.

[6] At sentencing, the Government intends to present the testimony of the case agent and approximately ten minutes of audio/video recordings related to Farzam's admissions. The Government anticipates its sentencing presentation will take approximately 30 minutes total.

Farzam telling the CI that he sold one of the firearms he purchased with Defendant to "Rich." Subpoenaed records also revealed that, as recently as November 2014, Farzam gave Defendant approximately $11,000.

After Defendant's initial arrest and arraignment in October 2014, she was released on bond pending trial.  Between that date and January 26, 2015, Defendant tested positive for cocaine three times.  Despite being confronted by both Pre-Trial Services and this Court regarding Defendant's drug use, Defendant vehemently denied using, and attempted to blame both the lab used to test Defendant's urine and the medication Defendant takes as a cancer patient.  (Transcript of Final Pretrial, ECF No. 38, at p. 24, 28.)  In addition, this Court granted Defendant leave from custody after the passing of Defendant's husband, only to revoke said leave approximately ten days later, citing reasons that demonstrated that Defendant behaved in a manner "sufficiently suspicious."  (Order Revoking Post-Conviction Bond, ECF No. 63, at 1.)

### D. Presentence Investigation Report

On June 9, 2015, The United States Department of Pretrial Services and Probation (hereinafter, "Probation") issued its final report to this Court regarding Defendant's sentencing. Probation calculated Defendant's base offense level to be 12, pursuant to U.S.S.G. section 2K2.1(a)(7), and applied a two-level enhancement for the number of firearms involved in Defendant's transaction, namely three.  See § 2K2.1(b)(1)(A).  There was no reduction to the offense level for acceptance of responsibility.[7]  Probation determined that Defendant has no germane criminal history, placing her in criminal history category I.

---

[7] The Government agrees that no adjustment for acceptance is appropriate, and Defendant did not object.  See U.S.S.G. § 3E.1.1 cmt. n.2 (2014); Def. PSR Objection, ECF No. 67.

## II.     **Sentencing Legal Framework**

The United States Sentencing Guidelines (U.S.S.G., or the Guidelines) are "effectively advisory."  United States v. Booker, 543 U.S. 220, 245 (2005).  The Supreme Court advised sentencing courts that, even "[w]ithout the 'mandatory' provision, the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals," specifically citing those goals listed in 18 U.S.C. § 3553(a).  Id. at 259.  Therefore, a district court must properly calculate and consider the advisory Guidelines range.  See e.g., Gall v. United States, 552 U.S. 38 (2007); United States v. Haj-Hamed, 549 F.3d 1020 (6th Cir. 2008).

In Rita v. United States, 551 U.S. 338 (2007), the Supreme Court held that courts of appeal may apply a non-binding presumption of reasonableness to a district court sentence that reflects a proper application of the Guidelines.  Id. at 347.  The Court further held that rather than having independent legal effect, a court of appeal's  "reasonableness" presumption "simply recognizes the real-world circumstance that when the district judge's discretionary decision accords with the Commission's view of the appropriate application of 18 U.S.C. § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable."  Id. at 350-51.  Therefore, to facilitate appellate review, the Sixth Circuit encourages a sentencing judge to "explicitly state [the] reasons for applying particular Guidelines, and sentencing within the recommended Guidelines range, or in the alternative, for choosing to sentence outside that range."  United States v. Jones, 399 F.3d 640, 650 (6th Cir. 2005); see also Gall, 552 U.S. at 38, and Haj-Hamed, 549 F.3d at 1020.

A judge may consider several types of information to assist in determining a defendant's appropriate sentence, including uncharged conduct; namely any evidence "that tended to show

how, not whether, the defendant committed the crime.  Oregon v. Guzek, 546 U.S. 517, 524

(2006) (emphasis supplied).  See also U.S.S.G. § 1B1.3(a)(1); United States v. Freeman, 640

F.3d 180, 189 (6th Cir. 2011) ("[U]ncharged conduct may be considered in determining specific

offense characteristics when such conduct is part of the same course of conduct or common

scheme or plan as the offense of the conviction." (internal citations omitted)).

   To assess a defendant's mental state for sentencing purposes, "a court may draw

common-sense inferences from circumstantial evidence."  United States v. Garcia, 635 F.3d 472,

478-479 (10th Cir. 2011) (quoting United States v. Juarez, 626 F.3d 246, 256 (5th Cir. 2010)).

The Federal Rules of Evidence are "inapplicable to miscellaneous proceedings," such as

sentencing hearings.  United States v. Bailey, 394 Fed.App'x 233, 237 (6th Cir. 2010) (internal

citations omitted).  As such, a sentencing judge may take into account hearsay testimony and

other relevant facts.  Id.; see also United States v. Davis, 170 F.3d 617, 622 (6th Cir. 1999)

("Hearsay evidence is admissible in guideline sentencing hearings.").  Facts are reviewed and

determined by a preponderance of the evidence.  Freeman, 640 F.3d at 189.

   **III.  Argument**

   The Government agrees with Probation's determination of Defendant's criminal history

category, but disagrees with the failure to include several specific offense characteristics or

adjustments in the total offense level calculation.  Based on the Government's calculation,

Defendant's offense level should be 24.  Therefore, the Government writes separately to urge the

Court to find the below enhancements are applicable, and to reiterate the need, under the factors

enumerated under Title 18 United States Code Section 3553(a), to sentence Defendant to the

high end of the guideline range, namely 63 months.

### A.  Guideline Calculation

The Government calculates that the following advisory sentencing guideline is applicable to Defendant's conduct, and will address each specific offense characteristic in turn:

| | | |
|---|---|---|
| Base offense level | 12 | §2K2.1(a)(7) |
| Multiple Firearms Purchased (3) | +2 | §2K2.1(b)(1)(A) |
| Firearms Trafficking | +4 | §2K2.1(b)(5) |
| In Connection With Another Felony | +4 | §2K2.1(b)(6)(B) |
| Abuse of Position of Trust – Primary Role in Offense | +2 | §3B1.3 |
| **Total Offense Level** | **24** | |

### 1.  Multiple Firearms Specific Offense Characteristic

The Guidelines instruct that a two-level enhancement should be applied when the number of firearms involved in the applicable transaction is between 3 and 7.  § 2K2.1(b)(1)(A).  This enhancement applies when the Government can show that each of the firearms counted were "unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed, including any firearm that a defendant obtained or attempted to obtain by making a false statement to a licensed dealer."  § 2K2.1 cmt. n.5 (2014).  Defendant's Sentencing Memorandum cites an analogous case.  In United States v. Lindsey, the Seventh Circuit upheld the lower court's application of the instant enhancement, despite the lack of testimony regarding defendant's possession of the third firearm at trial.  30 F.3d 68, 70-71 (7th Cir. 1994) (affirming the lower court's decision to apply the enhancement).

Here, it is uncontested that Defendant purchased each of the three firearms listed.  It was proven beyond a reasonable doubt at trial that Defendant purchased two AR-15s and the Smith and Wesson revolver by lying on the federal ATF Form 4473.  The guideline commentary explains that there is no need for further inquiry; in other words, that Defendant was able to

purchase the three firearms by lying on the form, is enough for the enhancement to apply. § 2K2.1 cmt. n.5 (2014).  See also United States v. Louchart, 680 F.3d 635, 640 (6th Cir. 2012) (a court must determine the number of firearms applicable by a preponderance of the evidence). For purposes of this enhancement, it is irrelevant what happened to the firearms after they were purchased.  Defendant's material lie to purchase the firearms is the crime for which Defendant was convicted, and therefore the focus of the enhancement's inquiry.  Three firearms were purchased based on a material lie that the firearms were for Defendant, when they were not. Therefore, two additional points should be added to Defendant's offense level.

Moreover, the evidence clearly demonstrated that none of the three firearms were actually for Defendant.  Farzam gave Defendant significant money before even coming to Cleveland.  Upon arriving in Cleveland, Farzam went with Defendant to Stonewall and accompanied her while Defendant purchased all three firearms.  The next day, three packages were sent, via Federal Express, from Cleveland to Farzam's California business address.  Two of the weapons were recovered directly from Farzam, and the evidence shows the likelihood that he had already sold the third weapon.  Defendant offers no other evidence to contradict this conclusion.  At the final pretrial, she told this Court that she did not possess the firearm and did not know where it was.  (Transcript of Final Pretrial, ECF No. 38, at p. 36.)  Accordingly, the available information demonstrates by a preponderance of the evidence that all three firearms were shipped from Solon to California, and therefore, a two-level increase in the offense level for the number of firearms is appropriate.

## 2.  **Firearm Trafficking Specific Offense Characteristic**

The Guidelines provide for a four-level increase in a defendant's base offense level for a

firearms offense if "the defendant engaged in the trafficking of firearms[.]"  U.S.S.G.

§ 2K2.1(b)(5).  The commentary to § 2K2.1 provides guidance, in relevant part:

> "Subsection (b)(5) applies, regardless of whether anything of value was exchanged, if the defendant— (i)  transported, transferred, or otherwise disposed of two or more firearms to another individual, or received two or more firearms with the intent to transport, transfer, or otherwise dispose of firearms to another individual; and (ii) knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual . . . (II) who intended to use or dispose of the firearm unlawfully.

U.S.S.G. § 2K2.1, cmt. n.13 (2014).

The inquiry should be centered on whether the defendant knew or had reason to believe

that "the straw purchase would result in the transfer of firearms to an individual who intended to

dispose of them unlawfully."  Garcia, 635 F.3d at 479.  The Sixth Circuit has upheld the

application of the § 2K2.1(b)(5) enhancement based on facts similar to the present case.

In United States v. Freeman, 640 F.3d 180, 189 (6th Cir. 2011), the Sixth Circuit had "no

problem" concluding the enhancement applied, because the defendant bartered and sold firearms

to a drug dealer for cash in the early morning hours.  The Circuit correctly concluded this "gave

[the defendant] reason to know or have reason to believe that [the] heroin dealer 'intended to use

or dispose of the firearm unlawfully.'"  See also United States v. Jenkins, 528 Fed.App'x 483,

486 (6th Cir. 2013) (holding that application of trafficking enhancement was appropriate because

one of the weapons defendant sold to undercover agent had obliterated serial number, another

weapon was an illegal, sawed-off shotgun, and defendant advertised one of the weapons as a

"murder weapon"); United States v. Cummings, 1994 WL 91825 at *2 (6th Cir., March 22,

1994) (holding that application of previous version of enhancement was appropriate where the

volume of defendant's firearm sales (14 sales) was "significant," handguns constituted the largest proportion of the weapons sold; defendant knew his customers were criminals; and his customers knew the firearms were stolen.).

In upholding the application of the trafficking enhancement in Freeman, the Circuit favorably cited United States v. Juarez, 626 F.3d 246, 252 (5th Cir. 2010), and United States v. Mena, 342 Fed.App'x 656, 658 (2d Cir. 2009).  In Juarez, the Fifth Circuit held that the fact that the transferee did not purchase firearms himself, the secretive nature of the transactions, and the fact that transferee paid $200 over retail cost gave defendant reason to believe that firearms were being purchased for an unlawful purpose.  626 F.3d at 252.  In Mena, on the other hand, the Second Circuit found that "'the circumstances of the offense conduct indicate by a preponderance of the evidence that [the defendant] knew or had reason to believe that his delivery of the firearms was to someone or people who intended to use or dispose of the firearms unlawfully,' where the defendant twice delivered firearms in a plastic bag for cash on a street in Manhattan."  42 Fed.App'x at 658.  See also United States v. West, 563 Fed.App'x 745, 747 (11th Cir. 2014) (upholding trafficking enhancement where, among other things, (1) the defendant sold seven firearms to undercover officers in several transactions; (2) the undercover officers told the defendant they intended to resell the firearms out of state; (3) the undercover officers sought and purchased firearms, such as handguns and assault rifles, designed for use on humans, not for hunting; and (4) there was discussion between the defendant and the undercover officers regarding obliteration of a serial number on one of the firearms.);  Garcia, 635 F.3d at 479 (discussing the clandestine nature of the straw purchase, and the ratio of defendant's income to the purchase amount, among other factors).

13

Just as in <u>Juarez</u>, the circumstances surrounding Defendant's firearms transaction, and the cover up after, support the addition of four points because Defendant transferred the firearms to an individual who intended to use them unlawfully. Steve Farzam transferred $2,500 into Defendant's checking account in the weeks leading up to the Stonewall purchase. At the time of the transaction, Defendant was making approximately $800 per week, and the purchase price of the three firearms represented nearly a month of her pay. Farzam then accompanied Masters to Stonewall, and purchased ammunition clips that fit the AR-15s Defendant purchased. It was discussed at trial that Farzam would have been unable to purchase the AR-15s himself, both in California (because of their illegal status) and in Ohio (since federally licensed dealers in Ohio require local identification to purchase).

After Defendant lied on the form, Defendant at the very least assisted Farzam in shipping them to California. Farzam eventually sold the AR-15 for a profit; more than $700 more than Stonewall's original purchase price. Since Defendant purchased the firearms on Farzam's behalf, she knew Farzam would be taking the firearms back to California. She knew possession of those firearms there would be illegal because (a) Gary Donnett warned her of such, and (b) Farzam paid her to purchase the firearms in the first place.

In addition, Defendant knew Farzam's possession and use of the AR-15s would be illegal in California. Defendant and Farzam previously had an intimate relationship and shared a residence. Defendant knew Farzam's interest in firearms. During the time she was living in California, she attempted to pursue a career in law enforcement. Most importantly, prior to the time these firearms were purchased, Mr. Donnett specifically told her that possession of the AR15 firearms in California was illegal.

It should be noted here that Defendant appears to argue that she had no knowledge that Farzam shipped the firearms the day after she purchased them on his behalf. While there is no requirement that the Government prove she knew about the shipment, the evidence demonstrates Defendant did have knowledge. At the time the firearms were purchased, no ammunition was purchased, which indicates that neither Defendant nor Farzam had any intention of using the firearms for sport. Within 24 hours after the firearms were purchase, they were shipped to California. The firearms were shipped from a Federal Express/Kinko's store located just a short distance from Defendant's place of employment and residence. Moreover, Defendant's credit card was used at the same Federal Express/Kinko's in Solon on or about the time the firearms were shipped under Farzam's account. Thus, Defendant's claim that she did not know that Farzam shipped the firearms lacks credibility.

That the Smith and Wesson pistol and one of the two AR-15s were found in Farzam's possession more than substantiates the inference that Defendant transferred the firearms to Farzam in some fashion. See United States v. Pepper, 747 F.3d 520, 525 (8th Cir. 2014) (citing Freeman, 640 F.3d at 189-90) ("the machine firearm that Pepper acquired from a pawn shop subsequently was found in Charles' possession, permitting the inference that Pepper transferred the machine firearm to Charles."). In addition, Defendant attempted to cover up her culpability by lying to Mr. Donnett after she was indicted and before trial by saying she had no knowledge of the firearms' destination, and told a similar lie to her friend Chief LaGatta.

Defendant's argument that the trafficking enhancement is not applicable because the third firearm, namely the AR-15, was never recovered, is misplaced. The enhancement requires only that two or more firearms be transferred. § 2K2.1 cmt. n.13(A)(i) (2014). While Farzam's possession of the Smith and Wesson pistol is not *per se* a felony, it is reasonable to infer, based

15

on the totality of the circumstances and the conversations Farzam had with the CI, that Farzam intended to sell the Smith and Wesson directly to a third party without using proper legal channels, which could also constitute a felony under California law. See C.P.C. § 27575, 27590. Therefore a transfer of one of the AR-15s and the Smith and Wesson would, by themselves, be enough to apply the enhancement.

However, in this case, there is sufficient indicia to infer that Farzam sold the other AR-15 purchased by Defendant for above-market value in a private transaction, thereby rendering at least both AR-15s, and at best, all three firearms applicable to the enhancement. Additional evidence was presented that Defendant gave Farzam all three firearms and worked with him to ensure their safe return to California. Later, Farzam indicated to the CI that one of the firearms he purchased with Defendant he sold to a man named Rich. The CI was able to preliminarily discuss purchasing another assault rifle from Farzam, who indicated he might be able to procure what the CI was looking for through Defendant. The other two firearms were seized by law enforcement. In addition, numerous other firearms, ammunition, police badges and vests were found in Farzam's possession, suggesting that this was not a one-off incident, and Farzam had a cache of items to sell to interested purchasers. The facts and circumstances surrounding Defendant's behavior demonstrate that Farzam possessed the AR-15s in California. Defendant did not need to know exactly how Farzam was planning to dispose of the firearms once he got them to California[8], since mere possession of the firearms was illegal there, hence the whole point of Defendant purchasing them on Farzam's behalf. For those reasons, the four-level trafficking enhancement should apply.

---

[8] A defendant does not need to know that the buyer will use the firearms to commit a specific felony. Cummings, 1994 WL 91825 at *5-6.

### 3.  <u>Possession/Use in Connection with Another Felony Offense Specific Offense Characteristic</u>

Under U.S.S.G. § 2K2.1(b)(6)(B), a four-level increase in a defendant's base offense level is justified for a firearms offense if "the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."  The Guidelines commentary explains that subsection (b)(6) "appl[ies] if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense, respectively."  U.S.S.G. § 2K2.1, cmt. n.14 (2014).  A district court should apply this enhancement only if the government can show "a nexus between the firearm and an independent felony."  <u>United States v. Taylor</u>, 648 F.3d 417, 432 (6th Cir. 2011).

Another felony offense means "any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained."  U.S.S.G. § 2K2.1, cmt. n.14 (2014).  This includes felony possession by the transferee.  <u>United States v. Jones</u>, 528 Fed.App'x 627, 632 (7th Cir. 2013) (language of enhancement applies to "<u>any</u> felony other than the one for which defendant is being sentenced." (emphasis supplied)).  The Sixth Circuit has upheld the application of the § 2K2.1(b)(6)(B) enhancement in two situations similar to Defendant's conduct here: namely, (1) when a defendant himself commits another felony offense, and (2) where a defendant transfers a firearm to another party with knowledge, or reason to believe, that the second party would use the firearm in a subsequent felony.  <u>See</u> <u>Id.</u>

Defendant's conduct is consistent with the application in the second scenario. The enhancement is applicable when the firearms are transferred to another person who then commits an independent felony, including possession. In Cummings, the defendant broke into residences, stole firearms, and then sold those firearms to those who subsequently engaged in criminal activity. 1994 WL 91825 at *1-2. In an interview, the defendant admitted that "he knew those who bought the stolen firearms were involved in criminal behavior." Id. at *2. The Sixth Circuit reasoned that because the defendant knew his customers were criminals, and because his customers knew the firearms were stolen, one could reasonably infer that the buyers were going to use the firearms in future criminal activity. Id. at *5.

Cummings also reiterated that a defendant does not have to be aware of any specific felony to be committed by the transferee/recipient, noting that the purpose of the section is to ensure the public safety by preventing the spread of firearms to those who could possibly threaten such safety through the commission of future felonies. Id. at *5-6. Therefore, a defendant who transfers firearms to another party, with any suspicion that the buyer, because of their criminal nature, could commit a future felony with the firearms, will be subject to a § 2K2.1(b)(6)(B) enhancement.

Cases outside the Sixth Circuit have also upheld the U.S.S.G. § 2K2.1(b)(6)(B) enhancement when the defendant has transferred a firearm with knowledge or reason to believe that the transferee would use the firearm in another felony. See United States v. Dupree, 388 Fed.App'x 164, 166-67 (3d Cir. 2010) (defendant's specific knowledge of transferee's criminal behavior, and inability to possess firearms was sufficient to infer the defendant knew what the transferee was going to do with the firearms). A court can consider the historical relationship between the two parties, the history of violent crime on the part of the buyer, and the fairly

18

obvious subsequent plan to commit a felony to determine the level of knowledge imputed to the transferor.  Id. at 166-69.  See also United States v. Molloy, 324 F.3d 35, 41-42 (1st Cir. 2003) (cert. denied, 538 U.S. 1067 (2003) ("'Although there must be a causal or logical relation or sequence between the possession and the related offense . . . we will find that a firearm has been used in connection with an offense if the possession has the potential to aid or facilitate the other crime.'").

Here, Defendant's conduct overwhelmingly supports the application of the § 2K2.1(b)(6)(B) enhancement.  Defendant fraudulently purchased AR-15s and the Smith and Wesson for Farzam on March 27, 2013, just weeks after Farzam had deposited $2,500 into Defendant's checking account.  Farzam told the CI he acquired the AR-15 through the assistance of his "girl Marcia."  Defendant had a $2.00 purchase on her credit card at the Solon, Ohio Federal Express/Kinko's on or about the time that the firearms were shipped.  The parties concealed their behavior by shipping them to California under the guise the firearms were violins.

In addition, Defendant used to reside in California, and applied to work as a police officer in California.  Coupled with Defendant's behavior in the instant offense, and Mr. Donnett effectively placing Defendant on notice to the status of the law, it is not unreasonable to conclude that Defendant would have known that possessing these firearms in California would constitute a felony, and that she would be transferring firearms with knowledge that their possession in California by Farzam was prohibited.[9]  Additionally, the intimate relationship

---

[9] California Penal Code Section 30600 makes possession of an assault weapon, such as the M4 AR-15 purchased by Defendant, illegal to possess, distribute, import, and/or offer for sale in the state of California.  See C.P.C. § 30600(a).  Even without direct knowledge of California's ban on assault weapons, "ignorance of the law or mistake of law is no defense to criminal

between Defendant and Farzam would have provided Defendant with knowledge of Farzam's past, and keen interest in law enforcement, giving her reason to believe that Farzam might engage in illegal conduct with the firearms.  With or without this knowledge, Defendant would still have had reason to believe that Farzam would use the firearms in a felony because of Farzam's disregard for the law when purchasing the firearms, and the nature of AR-15s as military-grade weapons.

Farzam's past felonious activity shows that he was not simply going to set the firearms aside as part of a collection, he was going to use them in one of his volatile pursuits. The First Circuit in, <u>Molloy</u>, explained that the defendant knew the buyer would use the firearms in another felony because the defendant was aware of the character of the buyer and what he used weapons for.  In that case, the defendant "did not portray the fictitious ex-marine [the buyer] as a benign hobbyist with an academic interest in military artifacts, but as 'a fucking nut' who manufactured pipe bombs and other weapons and was 'ready to blow shit up.'" <u>Molloy</u>, 324 F.3d at 42.  Defendant's awareness of Farzam's penchant for weapons and his interest in law enforcement would have provided her with reason to believe the firearms would be used in a felony.

Therefore, there is evidence to conclude that Defendant "transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."  U.S.S.G. § 2K2.1(b)(6)(B).  Defendant knew that Farzam would commit felony possession in California by possessing them once he received the package in California because she agreed to assist him in purchasing the firearms in the first

---

prosecution," and is "deeply rooted in the American legal system."  <u>United States v. Dodson</u>, 519 Fed.App'x 344, 350 (6th Cir. 2013) (<u>citing</u> <u>Cheek v. United States</u>, 498 U.S. 192, 199 (1991)).

place.  Moreover, the application of both the trafficking enhancement and the other felony

enhancement does not constitute "double counting," since Farzam committed other felonies

separate from trafficking the firearms themselves.   See U.S.S.G § 2K2.1 cmt. n.13(D) ("If the

defendant used or transferred one of such firearms in connection with another felony offense

(i.e., an offense other than a firearms possession or trafficking offense) an enhancement under

subsection (b)(6)(B) would also apply." (emphasis omitted)).  See also Freeman, 640 F.3d at

191; United States v. Sweet, 776 F.3d 447, 450-51 (6th Cir. 2015) (both enhancements "punish

different aspects of the conduct.").

    Given the nature of the AR-15s, and Defendant's understanding of Farzam's proclivity

for a borderline obsession with law enforcement, Defendant had reason to believe that Farzam

would be eager to commit a felony with the firearms.  For these reasons, the § 2K2.1(b)(6)(B)

sentencing enhancement should apply.

### 4.  Abuse of Position of Trust – Primary Role in Offense

    The Guidelines provide for a two-level increase in a defendant's base offense level "[i]f

the defendant abused a position of public or private trust, or used a special skill, in a manner that

significantly facilitated the commission or concealment of the offense."   U.S.S.G. § 3B1.3.  The

Commentary to § 3B1.3 provides that a position of trust is one in which the person is empowered

with authority because they are given discretionary judgment and deference.  U.S.S.G. § 3B.3,

cmt. n.1. (2014).  The section also applies to situations in which the person abuses their position

of trust to facilitate the commission of a crime.  United States v. Brogan, 238 F.3d 780, 783 (6th

Cir. 2001).

    The purpose of § 3B1.3 is to punish those who abuse the authority granted to them by

society to facilitate the commission of a crime, defend the "private ordering based on trust," and

also to provide "additional deterrence for crimes that are 'difficult to detect' due to the defendant's position.  Id.  Police and peace officers are in a position of trust "vested in the public to safeguard the public."  United States v. Clay, 320 Fed.App'x 384, 392 (6th Cir. 2009) (affirming the application of the enhancement when a prison guard smuggled a firearm into the prison where the guard worked and subsequently gave it to an inmate).

At the time of the sale, in March 2013, Defendant was employed as a full-time police officer in Oakwood Village, Ohio.  Defendant's Sentencing Memorandum seems to suggest that Defendant was suspended or laid off at the time of the instant conduct, which is not the case.  In fact, Defendant's only source of steady income during spring 2013 was her paycheck from the Oakwood Village Police Department.

At trial, Mr. Donnett testified specifically that he did not inquire further about the nature of this expensive transaction, even though Defendant was purchasing multiple expensive firearms while in the presence of a second individual, because he knew Defendant was a police officer.   Based on this knowledge, he was not suspicious of Defendant's conduct.  Defendant knew her position as a police officer would help facilitate the commission of her crime specifically because society is trained to trust officers of the law.  Defendant could have led Farzam to any other licensed firearm dealer in the metropolitan area, where they would not have known Defendant was a police officer.  Instead she chose the dealer with whom she had a previous relationship.  Masters even received a discount on her purchase because of her position. Mr. Donnett had an inherent amount of trust in Defendant because of her position, and asked no questions about the purchase of multiple firearms by one individual while in the presence of another.  This deference to Defendant's authority was evidence of the trust placed in the position and her abuse of this trust facilitated her ability to fraudulently execute the firearms transactions.

22

Therefore, the enhancement should apply.

## B. Additional Relevant Sentencing Factors under 18 U.S.C. § 3553(a)

### 1. The nature and circumstances of the offense

Defendant went to Stonewall on March 27, 2013 with the express intention of purchasing those firearms on behalf of Steve Farzam.  She had no intention of keeping them for herself, and assisted Mr. Farzam in shipping them the day after they were purchased back to California.  Defendant then lied about her involvement to at least two people, telling Chief LaGatta that her friend from California must have taken the firearms unbeknownst to her.  Defendant did not purchase any ammunition for the firearms, and felt no responsibility to report them stolen, further suggesting she was not planning to keep the firearms for herself.  Moreover, before trial, but after indictment, Defendant returned to Stonewall and asked Stonewall employee Gary Donnett, who sold Defendant the firearms, if he would testify on her behalf.  Defendant told Mr. Donnett a similar tale, and spent approximately 15 minutes discussing the matter.   The Government posits that Defendant was emboldened to engage in this behavior because of her status in the community as a police officer.

In addition, Defendant transferred two AR-15 Model M4 assault rifles to Mr. Farzam.  The AR-15s were designed for combat.  Because of the firearm's relatively small size, and ability to accept high capacity magazines, the AR-15 can be a particularly deadly weapon.

Defendant's employment as a local police officer at the time of the offense separates the egregiousness of this case from a typical straw purchaser scenario.  Not only was Defendant employed as a police officer, but she chose to purchase the firearms at Stonewall, where Mr. Donnett knew her, and knew that she was police.  She was able, with little effort, to secure a law enforcement discount on her illegal purchase.  Defendant had been a police officer for several

23

years, and received the benefits of significant law enforcement training.  (PSR, ECF No. 66, at

10.)  As part of Defendant's duties, she took an oath to uphold the law and protect the public, not

use her position to assist her in engaging in criminal behavior.

### 2.  The personal history and characteristics of the Defendant, including Defendant's Medical Condition

Defendant's personal history and characteristics do not significantly mitigate her criminal

behavior in this matter.  Defendant characterizes her childhood as "good," and she attended the

Hawken School, a prominent private high school on the east side of Cleveland.  (See PSR at 9-

10.)  Defendant had the opportunity to model and travel as a young person, and still maintains a

relationship with her adopted father.  (Id.)  Defendant was able to finish school, earn a college

degree, and make a living through steady employment.  (Id.)

Defendant asks this Court to consider her medical condition when imposing sentence in

this case.  While her diagnosis of cancer is certainly relevant her personal history and

characteristics, Defendant appears to be significantly over-stating the severity of her condition by

claiming that her condition is "obviously terminal with death looming in the near future."

(Defendant's Sentencing Memorandum, ECF No. 68, at 12.)  A review of the limited medical

records submitted with Defendant's Sentencing Memorandum demonstrates that, while she has

cancer, it is in remission.  Defendant's bone scan records show no new areas of concern, and

previous areas of concern are "stable in appearance."  Accordingly, the claim that she is "dying"

of cancer is a significant exaggeration.

The Bureau of Prisons medical staff provides essential medical services to all inmates in

a manner consistent with accepted community standards.  They use licensed and credentialed

health care providers.  Individuals with serious medical conditions are treated within ambulatory

care units or in hospitals associated with individual prisons.  At the time of sentencing, the Government will provide additional information regarding Bureau of Prisons medical treatment.

The Government has no objection to this Court considering Defendant's medical condition when imposing sentence.  However, the Government does not believe her condition is so serious as to merit a non-custodial sentence, as Defendant requests.  Defendant's medical records show that she is in remission and being monitored for any recurrence.  She is not on her death bed.  Releasing her without any significant term of imprisonment would not adequately address the need to punish her for her criminal activity.  Moreover, given Defendant's previous illicit cocaine use while released on bond, the Government is concerned that releasing Defendant would also not serve to protect the public from her.  If Defendant's medical condition changes, and her cancer does recur, she could be eligible for compassionate release by the Bureau of Prisons under 18 U.S.C. Section 3582(c)(1)(A)(i).  However, her current medical condition is not so serious as to warrant an extraordinary variance from the otherwise applicable advisory sentencing guidelines range.

### 3.  <u>The need to avoid unwarranted sentencing disparities</u>

Given the aggravating facts and circumstances in this case, a sentence at the highest end of the Guidelines range would not create any <u>unwarranted</u> sentencing disparities.  Defendant should receive a more significant sentence than the typical "lying and buying" case because of the nature of the weapons involved, the fact that Defendant was a police officer at the time, and because one of the weapons ended up being illegally sold by the person to whom Defendant transferred them.

25

### 4.  __Reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense__

There are currently a variety of federal, state, and local efforts to combat firearm violence, including court programs such as re-entry and prevention; as well as law enforcement, community and faith based groups that are dedicated to solving the firearm-violence that plagues the greater Cleveland area.  Other law enforcement initiatives such as the Violent Firearm Reduction and Interdiction Program (VGRIP) have been used in the past in both Cleveland and Youngstown.  Despite those efforts, recidivism among convicted felons illegally in possession of firearms remains high.  Some members of law enforcement have opined that state prison sentences do not adequately deter offenders from possessing a firearm.  Upon the recent death of an off-duty Akron Police Officer who was killed in a shooting, Akron Police Chief James Nice stated,"[T]he typical person in Summit County arrested for having an illegal firearm does not do a day in jail…  As chiefs, all we can do is keep arresting people." [10]

Clearly, the community's perspective regarding firearm violence, and the possession and use of firearms acquired illegally in Northeast Ohio, is relevant to the sentencing factors in 18 U.S.C. § 3553(a).  Specifically, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to afford deterrence to other criminal conduct and protect the public must be imposed according to the community standards in which the offender resides, and the resounding message is that the unlawful possession of firearms is a serious crisis in the community.  Federal sentences should, and must, be imposed to reflect the community's intolerance of the violence that results from the illegal possession, use, and trafficking of firearms.   The methods by which individuals are able to obtain firearms so readily

---

[10] November 16, 2014, Cleveland.com

in this community, and across the country, are central to any discussion of firearm violence. That Defendant was a police officer at the time of the purchase makes this case more egregious than the typical firearms matter.

**IV.** **Conclusion**

For the reasons stated above, the Government believes Defendant's total offense level to be 24, and therefore respectfully requests this Court sentence Defendant to 63 months' imprisonment.

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney

By:    /s/ Marisa Darden
       Marisa T. Darden (NY: 4717682)
       Matthew B. Kall (NY: 3003738)
       Assistant United States Attorneys
       United States Court House
       801 West Superior Avenue, Suite 400
       Cleveland, OH 44113
       (216) 622-3758
       (216) 522-2403 (facsimile)
       Marisa.Darden@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of June 2015 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Marisa Darden
Marisa Darden
Assistant U.S. Attorney